IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALEX COOPER, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:14-CV-0545 |
| | : | |
| v. | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| EQT PRODUCTION COMPANY | : | Magistrate Judge Kemp |
| | : | |
| Defendants. | : | |

## **OPINION**

Before the Court are Plaintiffs' Motion for Partial Summary Judgment as to Count One of the Complaint (Doc. 16), and Defendant's Motion for Summary Judgment as to all claims made against it (Doc. 17). This case concerns a lease of oil and gas rights on real property. The issues the Court must resolve are whether Defendant's failure to commence a well on Plaintiffs' property by October 6, 2013 constitutes material breach of said Lease, and whether there is enough evidence to warrant submission to a jury that Defendant defrauded Plaintiff into executing the Lease. For the reasons below, Defendant's motion is **GRANTED**, and Plaintiffs' motion is **DENIED**.

### I. BACKGROUND

#### A. The Lease

On October 6, 2008, Plaintiff Alex Cooper, et al. ("Plaintiffs") executed an oil and gas lease with Defendant Equitable Production Company ("EQT.") (Compl., Doc. 3, ¶5.) The Lease contains a number of terms: the Lease grants EQT certain rights, including (among others) the right to explore for, operate, produce, and market, oil and gas including their liquid or gaseous

1

constituents; the right to store gas and to protect stored gas; and the right to complete and operate injection wells for the disposal of produced fluids. (Cooper Lease, Doc. 16-2 at 1.) The Lease gives EQT these rights for an initial primary term period of five years, from October 6, 2008 to October 6, 2013. (*Id.* at 3.) It includes an option giving EQT the unilateral right to extend the primary term for an additional five years by making an extension payment to Plaintiffs. (*Id.* at 4.) EQT paid all rent for the lease up-front. (*Id.* at 3.) The Lease includes a waiver of EQT's duty to develop, allowing that it "may drill or not drill on the leased premises as it may elect, and the consideration and rentals paid, and to be paid[,] constitute adequate compensation for such privilege," and that there "shall be no implied covenant to develop, produce, market, or drill one or more wells within the primary term [or] any extension thereof" of the agreement. (*Id.*) It also includes a surrender clause, giving EQT the right to surrender the Lease at any time by paying $1.00 to Plaintiffs. (*Id.* at 4.)

Finally, and pertinently, the Lease obligates EQT "to commence a well on said premises on or before the 6th of October, 2013." (*Id.* at 3.)

### B.  Procedural History

On May 7, 2014, Plaintiffs filed a three-count Complaint in the Common Pleas Court of Jefferson County, Ohio. (Doc. 3.) The first count alleges breach of contract. (*Id.* at 2.) Plaintiffs allege that EQT promised, and failed, to commence a well on Plaintiffs' property (or indeed anywhere in the county) by October 6, 2013, and that this failure was both material and fundamental to the purpose for which the lease was entered into and, thus, a breach of the agreement. (*Id.*, ¶¶11-15.) Plaintiffs further allege that as a direct and proximate cause of EQT's

2

failure to commence a well Plaintiffs have been materially damaged, through the loss of royalty payments since at least October 6, 2013, in excess of $25,000.00.[1] (*Id.*, ¶¶16-17.)

The second count alleges fraud in the inducement. (*Id.* at 4.) Plaintiffs allege that EQT's express commitment to commence a well in the specified time was made falsely or with utter disregard and recklessness as to its veracity, given that EQT knew Jefferson County lacked supporting infrastructure for the type of drilling rights sought (namely deep horizontal drilling). (*Id.*, ¶¶21-22.) Plaintiffs further allege that EQT's express commitment to commence a well was made with the intent to mislead Plaintiffs to rely on it and to induce them to execute the agreement. (*Id.*, ¶23.) Plaintiffs allege that EQT's promise to commence drilling the well on Plaintiffs' real property was material and fundamental to the transaction at-hand, noting that the sole purpose of a landowner executing such a lease is to realize the production of oil and gas and its resulting royalty income. (*Id.*, ¶20.) Plaintiffs aver that they relied to their detriment on EQT's false promise to commence a well in the specified time, said injuries including lost royalty and the burden of being forced into an additional five-year term. (*Id.*, ¶25.) Plaintiffs demanded lost royalty due to them along with punitive damages amounting to $3,000,000.00 (*Id.* at 6.)

The final count requests a declaratory judgment brought pursuant to Ohio Revised Code §2721.03. (*Id.* at 5; ¶28.) Plaintiffs ask the court to find the arbitration and venue selection provisions of the agreement both substantively and procedurally unconscionable, commercially unreasonable, and unlawful under Ohio Revised Code § 4113.62. (*Id.*, ¶27.) These provisions purported to give EQT the sole discretion to settle any dispute concerning the agreement by binding arbitration in the forum of Charleston, West Virginia. (Doc. 16-2 at 4.)

---

[1] Although the Complaint alleged damages, the briefings show that Plaintiffs want specific performance as a remedy, the appropriateness of which is discussed below.

On June 9, 2014, EQT removed the case to this Court pursuant to 28 U.S.C. §1332. (Notice of Removal, Doc. 2 at 1.) EQT's acknowledgment of this Court's jurisdiction renders the Complaint's third count moot.

On March 2, 2015, Plaintiffs and EQT filed cross-motions for summary judgment (Docs. 16 and 17, respectively.) Each side seeks summary judgment as to the first count, which is breach of contract, and EQT seeks summary judgment as to the second count, which is fraud in the inducement. (*Id.*)

The motions evince no material facts in dispute. It is undisputed that EQT has properly extended the lease, extending its primary term through October 6, 2018. It is also undisputed that EQT failed to commence a well on or before October 6, 2013. In dispute is whether that failure breaches the agreement and, if so, what to do about it.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs.*,

*Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250 (citation omitted); *Guarino*, 980 F.2d at 405.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere existence of a scintilla of evidence in support of the opposing party's position is insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251 (citation omitted); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

### III. ANALYSIS

#### A. Breach of Contract

##### 1. Standard

Plaintiffs seek a judicial finding that the Lease, when read in its totality, required EQT to commence a deep well on or before October 6, 2013, and that EQT's failure to do so is a material breach. (Doc. 16 at 5.) As a remedy, Plaintiffs petition the Court to order EQT to commence a deep well as soon as possible. (*Id.* at 12-13.) EQT contends that the Lease requires

it to commence a well by the end of the extended primary term, which is now October 6, 2018. (Doc. 17 at 1.)

In interpreting a contract, the Court's role is "to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). To that end, the Court will "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Id.* The Court will attempt to effectuate every provision of the Lease, so "if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose," then the latter construction controls." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citation omitted). The Court may examine extrinsic evidence to evince intent, but it may do so "[o]nly when the language of a contract is unclear or ambiguous." *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992). And such ambiguity exists "[o]nly when a definitive meaning proves elusive." *State v. Porterfield*, 829 N.E.2d 690, 692 (Ohio 2005).

## 2. Discussion

At issue is whether the Lease's terms required EQT to commence a deep well on Plaintiffs' property on or before October 6, 2013, or before the end of the primary term, which was initially October 6, 2013 but is now October 6, 2018. Both sides highlight provisions and characteristics of the Lease to help the Court make that determination. Neither side suggests the Court consider extrinsic evidence. The Court agrees. The Lease's terms are unambiguous.

Plaintiffs argue that EQT's choice of an "exact, unambiguous deadline of October 6, 2013" to commence a well is critically important, and that the Lease could have obligated Defendant to commence a well "'on or before the *end of the primary term (or extended primary*

6

*term).'"* (Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., Doc. 19 at 5, 7.) Indeed. Had the Lease used that language, there would be no controversy. This merely creates the problem, though; it does not solve it.

Plaintiffs also note that the phrases "commence a well" and "drill a well" have independent meanings in the Lease. (Doc. 17 at 6.) On this there is no disagreement. It is undisputed that neither "commencing" nor "drilling" has taken place, (Def.'s Reply in Opp. to Pls.' Mot. for Summ. J., Doc. 20 at 5-6), and EQT does not contend that "commencing" and "drilling" are in any way synonymous. Still, the difference between "commencing" and "drilling" warrants discussion.

Ohio law defines "commencement" as "[a]ny act, the performance of which has a tendency to produce the desired result." *Henry v. Chesapeake Appalachia*, 739 F.3d 909, 913 (6th Cir. 2014) (quoting *Duffield v. Russell*, 10 Ohio C.D. 472, 474 (Ohio Cir. Ct. 1899)). The distinction between "commencing" and "drilling" is necessary to sustain Plaintiffs' argument, but it does not advance their case. The distinction is necessary for the survival of Plaintiffs' argument because Plaintiffs admit that EQT is under no obligation to drill. (Doc. 19 at 6.) Specifically, the Lease provides:

> It is agreed that said Lessee may drill or not drill on the leased premises as it may elect, and the consideration and rentals paid, and to be paid constitute adequate compensation for such privilege. There shall be no implied covenant to develop, produce, market, or drill one or more wells within the primary term, any extension thereof, or the secondary term of this Agreement.

(Doc. 16-2 at 3.) Failing to distinguish between "commencing" and "drilling" would put Plaintiffs in the position of arguing that the Lease obligates Defendant to do the same thing that Defendant has no obligation to do, which is impossible.

7

Even granting that distinction, however, Plaintiffs' current position is also impossible. Plaintiffs maintain that EQT was obligated to commence a deep well on or before October 6, 2013, and they demand that EQT commence that well as soon as possible by undertaking an "honest and bona fide" physical act to that end. (Doc. 16 at 10-11.) This puts them in the position of demanding that EQT make a good faith effort to commence a well it rightly has no intention to develop, which is impossible. *See, e.g., Henry*, 739 F.3d at 913 (quoting *Duffield*, 10 Ohio C.D. at 474) (finding commencement for activities "done honestly and *bona fide*, with the intention of developing").

In support of its position, EQT refers to the original up-front payment and points to language in the Lease's option to extend:

> Prior to the expiration of the primary term hereof, Lessee…shall have the right and option to extend the primary term hereof for an additional five (5) years by making an extension payment to Lessee . . . equal to the per acre bonus amount paid to Lessor upon execution of this lease.

(Doc. 16-2 at 4.) EQT was initially required to pay Plaintiffs an up-front, paid-up, one-time rental payment to last through the primary term ending October 6, 2013. (Doc. 16-2 at 3.) EQT tendered the same up-front rental payment timely to Plaintiffs by depositing in the mail (properly stamped and addressed) two checks in the amount of $4,170.00 each, sent to Plaintiffs, for a total payment of $8,340, properly exercising its option. (Doc. 20 at 2; Doc. 16-2 at 4.) EQT argues that those rental payments serve as the alternative to development of the property, including commencement of a well, noting that the rental payment was intended by the parties as consideration for (among other things) the express waiver of EQT's otherwise implied duty to develop. (Doc. 20 at 2; Doc. 16-2 at 3.)

The Court agrees with this interpretation, and other cases bear it out. *Hupp v. Beck Energy*, 20 N.E.3d 732 (Ct. App. Ohio 2014), e.g., is illustrative. In *Hupp*, the court was tasked

with determining whether an oil and gas lease was a no-term perpetual lease and, thus, void as a violation of public policy. 20 N.E.3d at748-49. There were two clauses at issue, the first providing:

> This lease shall continue in force and the rights granted hereunder be quietly enjoyed by the Lessee for a term of ten years and so much longer thereafter as oil and gas or their constituents are produced or are capable of being produced on the premises in paying quantities

*Id.* at 749. The second:

> This lease, however, shall become null and void and all rights of either party hereunder shall cease and terminate unless, within 12 months from the date hereof, a well shall be commenced on the premises, or unless the Lessee shall thereafter pay a delay rental of ____ each year, payments to be made quarterly until the commencement of a well. A well shall be deemed commenced when preparations for drilling have commenced.

*Id.* The court ultimately determined that the lease did not violate public policy, *Id.* at 757. In doing so it relied in no small part on the second clause above, the lease's delay rental clause, stating flatly that "[t]he *entire* premise behind a delay rental clause is to delay drilling during the primary term. *Id.* at 756 (emphasis added). *See, e.g., Bohlen v. Anadarko E & P Onshore, LLC*, 26 N.E.3d 1176, 1179 (Ct. App. Ohio 2014) ("Traditional oil and gas leases in Ohio contain a 'drill or pay clause,' which is also known as a delay rental provision. This provision allows the lessee to defer drilling a well during the primary term of an oil and gas lease by compensating the lessor for the delay.") (quoting *Ohio Real Estate Law* at Section 47:9).

*Ionno v. Glen-Gary Corp.*, 443 N.E.2d 504 (Ohio 1983) is not square with the instant case but it is also instructive.[2] It is instructive because it discusses the purpose and operation of rental payments in oil and gas leases. The *Ionno* court had to determine whether an annual advance payment credited against future royalties relieved the developer of its implied obligation

---

[2] It is not square with the instant case because it concerns an alleged violation of an oil and gas developer's implied duty to develop, which duty EQT has expressly waived.

9

to develop the land reasonably. *Ionno* at 505. It ultimately determined that the rental payments against future royalties did not relieve the developer of its duty to develop the land, but it distinguished between those rental payments and what we have in the instant case, which is an agreement that "exacts a non-refundable . . . payment of rent to the lessor as separate and independent consideration for the lease." *Id.* at 507. EQT's rental payments made as consideration for a waiver of its implied duty to develop is the sort of arrangement explained and approved by the *Ionno* court, and it is the arrangement that this Court recognizes and likewise approves.

      Plaintiffs point out that the ultimate purpose of an oil and gas lease is the production of oil or gas, and they express concern that EQT secured its rights to Plaintiffs' property in mere speculative fashion. (Doc. 19 at 6.) Although they stop short of explicitly arguing that EQT's reading of the Lease violates public policy, the Court finds the concern well taken, yet ultimately unconvincing. Ohio's policy is "to encourage oil and gas production when the extraction of those resources can be accomplished without undue threat of harm to the health, safety, and welfare of" its citizens. *Newbury Twp. Bd. Of Trustees v. Lomak Petroleum (Ohio), Inc.*, 583 N.E.2d 302, 304 (Ohio 1992). To that end, long-term oil and gas leases that merely encumber property and offer no development impede productivity and thus may be found to violate public policy. *Ionno*, 443 N.E.2d at 508. In *Ionno*, discussed above, the court hypothesized that an oil and gas lease giving lessees the option to pay rent in perpetuity instead of developing the land would violate public policy, *id.*, but this Court is not concerned about that here, where the Lease's primary term is limited to October 6, 2018—hardly the perpetual encumbrance imagined in *Ionno*. Further, Plaintiffs and EQT all benefitted from the rental payments tendered by EQT to Plaintiffs to secure both the initial primary term and its extension; Plaintiffs received rental income and EQT

purchased the right to develop the land *or not* during the Lease's primary term as it deemed appropriate. (Doc. 16-2 at 3.) The Court will not disturb that bargain, mindful of the fact that "[t]he right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to write and to speak without restraint." *Blount v. Smith*, 231 N.E.2d 301, 305 (Ohio 1967).

Plaintiffs note that there is a difference between options to extend and options to renew, pointing out that options to extend simply "lengthen the existing agreement for a new period of time." *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 362 (6th Cir. 2014). This is true yet irrelevant. It is undisputed that EQT has extended the Lease for a new period, and EQT does not and need not rely on contract renewal to reach the current state of affairs, which is that the Lease is valid, and the phrase "on or before October 6, 2013" means "on or before the end of the primary term," and thus, that there has been no breach by EQT in failing to commence a well.

Even if there were breach, the appropriate remedy would not be for specific performance as Plaintiffs request, and the Court would likely not order EQT to commence a well. Although such a decree rests within the sound discretion of the Court, it is "not a matter of right, but of grace, granted on equitable principles." *Green, Inc. v. Smith*, 40 Ohio App.2d 30, 39 (Ct. App. Ohio 1974) (citation omitted). As EQT notes in its Motion for Summary Judgment, the equitable remedy for the failure of a lessee to develop oil and gas is usually forfeiture, i.e. cancellation of the lease. *See, e.g., Ionno*, 443 N.E. 2d 504 (Ohio 1983) (discussing the appropriateness of forfeiture when Lessor proves damages inadequate); *Lake v. Ohio Fuel Gas Co.*, 207 N.E.2d 659, 663 (Ct. App. Ohio 1965) (noting that under Ohio law, "in the absence of conflict with an express covenant in the lease, a court of equity may decree the cancellation of the lease as to the

11

undrilled portion of the leased premises in lieu of specific performance") (citation omitted). If the Court found EQT in breach it would likely find forfeiture to be the appropriate remedy. The Court, however, finds no breach.

So as to Count One, **Plaintiffs'** Motion for Summary Judgment is **DENIED**, and **Defendant's** Motion for Summary Judgment is **GRANTED**.

### B. Fraud in the Inducement

Plaintiffs allege that EQT defrauded them into executing the Lease. (Doc. 3 at 4-5.) According to Plaintiffs, EQT's express commitment to commence the well on Plaintiffs' property on or before October 6, 2013 was made falsely, or with utter disregard and recklessness as to its veracity, and the commitment was "material and fundamental to the transaction at hand under the Lease." (*Id.*, ¶¶19-20, 23.) Plaintiffs further allege that their reliance on that promise has caused them injury. (*Id.*, ¶25.)

Under Ohio law, "[w]here a contract has been procured by fraud," the defrauded party has the choice to "have the contract set aside" and be restored to her original position[3] or to "sue for damages caused by the fraud of the guilty party." *Cross v. Ledford*, 120 N.E.2d 118, 122 (Ohio 1954). The elements to be proved are: (1) an actual or implied representation of material fact; (2) that is false and; (3) made by one party with knowledge of its falsity to the other party; (4) with the intent to mislead the other party and; (5) upon which the other party rightfully relies. *Id.* The complaining party must prove each one of these elements with evidence that is "clear and convincing." *Id.*; *First Discount Corp. v. Daken*, 60 N.E.2d 711, 714 (Ct. App. Ohio 1944).

As Plaintiffs readily admit, finding that the Lease imposed no obligation on EQT to commence a well on Plaintiffs' property on or before October 6, 2013 is fatal to their claim of

---

[3] Which provides even more support for the Court's likely decision to award forfeiture of the Lease if it found breach instead of Plaintiffs' request for specific performance (discussed *supra*.)

12

Fraud in the Inducement on the part of EQT. (Doc. 19 at 12.) If there were no obligation for EQT to commence a well by that date, then there was no false representation. Without false representation, the claim must fail. *See First Discount Corp.*, 60 N.E.2d at 714. The Court finds no such obligation. The Lease, when read in its totality, requires EQT to commence a well on or before the end of the Lease's primary term, not on or before October 6, 2013. As such, there was no false representation made by EQT, and its Motion for Summary Judgment as to the the Count of Fraud in the Inducement is **GRANTED**.

## ORDER

**Plaintiffs'** Motion for Summary Judgment is **DENIED** and **Defendant's** Motion for Summary Judgment is **GRANTED**. Count Three of the Complaint is **MOOT**. This case is **DISMISSED**.

**IT IS SO ORDERED**.

                                                s/Algenon L. Marbley
                                                **ALGENON L. MARBLEY**
                                                **UNITED STATES DISTRICT JUDGE**

**DATE: December 18, 2015**